Roosevelt N. Nesmith, Esq. (RN008271997)
**LAW OFFICE OF ROOSEVELT N. NESMITH, LLC**
363 Bloomfield Avenue, Suite 2C
Montclair, New Jersey 07042
Tel.: (973) 259-6990
Email: *roosevelt@nesmithlaw.com*
*Attorney for Plaintiff and the Putative Class*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

-----------------------------------------------x

| | | |
|---|---|---|
| JANE ANN HART, | : | Civil Action No._____ |
| Plaintiff, | | |
| | : | **COMPLAINT** |
| vs. | : | Class Action |
| WELLS FARGO BANK, N.A, | : | Jury Trial Demanded |
| Defendant. | | |
| | : | |

-----------------------------------------------x

Plaintiff Jane Ann Hart ("Plaintiff" or "Hart"), by way of class action complaint on behalf of herself and all others similarly situated against defendant Wells Fargo Bank, N.A. ("Defendant or "Wells Fargo") states and alleges as follows:

### THE PARTIES

1.      Plaintiff Jane Ann Hart resides at 4109 Atlantic-Brigantine Blvd., Brigantine, New Jersey.  Hart executed a non-purchase money loan agreement secured by her home with World Savings Bank, FSB in February 2004 (the "Mortgage Loan").  She also executed a home equity line of credit with World Savings Bank, FSB in March 2004 (the "HELOC").  World Savings Bank, FSB changed its name to Wachovia Mortgage FSB on December 31, 2007.  Wachovia Mortgage, FSB was acquired and merged by defendant Wells Fargo Bank, N.A., effective

November 1, 2009.  During all times relevant to this action defendant Wells Fargo Bank, N.A. serviced Plaintiff's Mortgage Loan and HELOC.

2.      Wells Fargo Bank, N.A.  ("Defendant" or "Wells Fargo") is a national banking association chartered under the laws of the United States with its primary place of business in Sioux Falls, South Dakota.  Wells Fargo provides personal and commercial banking services and mortgage servicing.  It is the third largest bank in the United States by total assets.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2,119 Stat. 4 (codified in various sections of 28 U.S.C.).

4.      Plaintiff Jane Ann Hart is a citizen of New Jersey.

5.      Defendant Wells Fargo Bank, N.A.'s primary place of business is Sioux Falls, South Dakota.  The amount in controversy exceeds $5,000,000, and there are at least one hundred members of the putative class.  Further, in determining whether the $5 million amount in controversy requirement of 18 U.S.C. § 1332(d)(2) is met, the claims of putative class members are aggregated.

6.      The Court has jurisdiction over Defendant Wells Fargo because it does business in this State of New Jersey and the events giving rise to these claims occurred within the State of New Jersey.

7.      Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendant transacts business and may be found in this District and a substantial portion of the practices complained of herein occurred within New Jersey.

8.      All conditions precedent to this action have occurred, been performed, or have been waived.

## NATURE OF THE CASE

9.     Plaintiff has brought these claims against Defendant to redress injuries she and the Class have suffered and will continue to suffer, as a result of Wells Fargo's unlawful practices in its servicing of mortgages.  Plaintiff alleges that in connection with its mortgage loan servicing, Wells Fargo engaged in a fraudulent scheme in violation of federal and state law, assisted by a nationwide web of outside vendors who acted in concert with it to extract improper inspection fees from homeowners who had fallen into arrears on their mortgages.

10.     These improper inspection fees were imposed on borrowers as additional loan charges, which this action seeks to recover, and placed Hart and other borrowers whose mortgages were serviced by Wells Fargo in difficult financial straits, putting their homes in jeopardy and, in some instances, resulting in bankruptcy.  *See e.g. In re Dorothy Chase Stewart,* No. 07-11113, 2008 WL 2676961 (Bkrtcy. E.D. La. July 9, 2008) (*"Stewart"*) (stating that Wells Fargo's bogus fees and other misconduct forced homeowner into bankruptcy).  Hart now seeks return of these inflated, bogus inspection fees.

11.     Upon information and belief Wells Fargo utilizes a computer system to automatically assess fees for property inspections without regard to the terms of the borrowers' mortgage loans or the relevant circumstances.  Instead of being based upon reasonable parameters, the computer system was programmed to assess as many charges as possible and to pay first all outstanding fees and costs before satisfying interest and principal.  Further, Wells Fargo concealed the nature of the fees being assessed on monthly statements mailed to Hart and Class members by describing them simply as "other" charges.  In this manner, Wells Fargo victimized and further increased the indebtedness of persons who were already in danger of losing their homes to

3

foreclosure.  Wells Fargo ' scheme continued for years and was in existence when Hart and Class members obtained their mortgages.

12.     Wells Fargo has a history of unconscionable conduct in imposing unwarranted inspection fees on borrowers' accounts.  In *In re Dorothy Chase Stewart,* No. 07-11113, 2008 WL 2676961 (Bkrtcy. E.D. La. July 9, 2008) (*"Stewart"*), the court found that Wells Fargo's unlawful practice of charging fees to distressed borrowers had resulted in the assessment of multiple late fees for a single missed payment as well as assessment of an inspection fee on average once every month and a half over a seven year period, deepening the debtor's default although the borrower's property always had been occupied and in good condition.  Moreover, the inspections generated by Wells Fargo's automated system were never read or reviewed by any Wells Fargo employee, further demonstrating that the inspections were simply a profit generating mechanism and were not necessary to safeguard the lender's interests.

13.     As held by Honorable Elizabeth W. Magner in the Wells Fargo foreclosure matter at issue in *Stewart:*

> The Court concludes. . .that Wells Fargo has a corporate practice that fails to notify borrowers that fees, costs, or charges are being assessed against their accounts.
> ***
> Wells Fargo's [conduct is] abusive behavior . . . in particular, the abusive imposition of unwarranted fees and charges (late fees and inspection costs).

*Id.* at 342

14.     In addition, Wells Fargo's wrongful imposition of inspection fees was the subject of a class action lawsuit styled *Young v. Wells Fargo & Company and Wells Fargo Bank, N.A.,* No. 4:08-cv-507 RP-CFB (S.D. IA. Aug. 5, 2008) (the "*Young*").  Wells Fargo settled the *Young* action by entering into an agreement that certified a settlement class of "[a]ll Perons who have or

had a mortgage serviced by Wells Fargo and owe or paid a property inspection fee assessed during the period August 1, 2004 through December 31, 2013, inclusive." Wells Fargo charged Hart's loan accounts for inspection fees during the *Young* class period, yet she did not receive notice of the *Young* action or settlement, and did not otherwise release claims against Wells Fargo in that action. In addition, Wells Fargo continued its unlawful conduct after the *Young* class period. The conduct for which Hart and the Class seek damages occurred before and after December 31, 2013.

15.     Wells Fargo has profited enormously from this fraudulent scheme. As the *Stewart* court observed, Wells Fargo's assessment of inspection fees on home mortgage loans it services generates hundreds of millions of dollars in revenues for Wells Fargo.

16.     Hart has brought this action to again put an end to Wells Fargo's scheme and to recover the improper, unwarranted and unreasonable fees charged to Hart and Class members.

## FACTUAL ALLEGATIONS

17.     Hart's mortgage loans were serviced by Wells Fargo from their origination with World Savings Bank, FSB in 2004 until it transferred its responsibilities to another servicer effective April 27, 2021.

18.     Every home mortgage contains provisions specifying when payments are due and when they are considered late, and providing that only reasonable fees may be assessed if payments are not timely. Hart's mortgages are typical in this regard. Hart's Mortgage Loan and HELOC permitted Wells Fargo. or its agents. to do and pay for whatever is reasonable or appropriate to protect the lender's interest in the Property.   In these respects, Hart's mortgage terms and notes were substantially identical to the mortgage terms and note of the debtor in *Stewart* and the plaintiffs in the *Young* case. Copies of Hart's Mortgage Loan and HELOC are attached hereto as exhibits A and B, respectively.

19. The vast majority of borrowers make their monthly mortgage payments to mortgage servicing companies, such as Wells Fargo, rather than their original lender or the current holder of the mortgage note. Wells Fargo services over $1.5 trillion in mortgages, making it the largest home mortgage servicer in the United Sates.

20. As part of its mortgage servicing operations, Wells Fargo collects monthly payments from borrowers consisting of principal and interest, taxes and insurance, and other fees and charges that may have been assessed and disburses these payments to the appropriate parties such as lenders, investors, taxing authorities, insurers, and other relevant persons.

21. Wells Fargo earns revenue from mortgage loan servicing in three ways. Wells Fargo receives a fixed fee for each loan which is determined by servicing agreements between Wells Fargo and the investors or note holders. Wells Fargo also earns "float" income from accrued interest between when consumers make their mortgage payment and when those funds are remitted to lenders, investors, taxing authorities, insurers, and other relevant parties. Wells Fargo also retains all, or part, of certain fees, such as inspection fee charged to consumers.

22. Because Wells Fargo earns "float" income on funds held and retains all or part of certain fees charged to borrowers, Wells Fargo has an incentive to impose additional fees on consumers.

23. Since at least 2001, Wells Fargo has managed and administered its residential mortgage servicing tasks through the use of general computer software packages with little or no human intervention.

24. Upon information and belief, entries on home loan accounts serviced by Wells Fargo were tracked with a licensed computer software platform known as Fidelity Mortgage Servicing Package (also known as "Fidelity MSP"). Wells Fargo changed its software package

from Fidelity MSP to Loansphere MSP ("Loansphere MSP") in or about 2015. Wells Fargo's practices with regard to the unlawful imposition of property inspection fees were carried out using the Fidelity MSP and the Loansphere MSP computer programs.

25. When Wells Fargo receives a payment for a mortgage loan account from a borrower, that payment is entered into the computer software and the payment is deposited. The computer system then applies the payment to the borrower's account.

26. The Fidelity MSP, and subsequently the Loansphere MSP program, applies computer logic to certain events, triggering automatic action on the loan file. More particularly, guidelines for the management of loans serviced by Wells Fargo – *e.g.*, when drive-by inspections are ordered – are imported into computer system's internal logic and automatically applied. Charges and fees, such as fees for property inspections, are assessed against the account by virtue of "wrap around" software packages maintained by Wells Fargo. These software packages interface with Fidelity MSP/Loansphere MSP and also implement decisions on the loan file based on internal computer logic.

27. If a borrower is late making a payment, Wells Fargo's computer system will automatically order a property inspection and charge the borrower's account for this inspection after the loan has been in default for a certain number of days regardless of whether there is a reasonable need for an inspection. In most cases, the computer system automatically recommends a property inspection if the borrower has been in default for between 20 to 45 days. Wells Fargo orders duplicative inspection fees on properties for which it services a first mortgage loan and a second mortgage loan, such as a home equity line of credit. Wells Fargo imposes double inspection fees on these mortgage accounts without regard to its reasonable need to protect its interests in the borrowers' properties.

28.     Wells Fargo's computer system automatically generates work orders for property inspections without human intervention.  No person or employee of Wells Fargo is involved in the determination of whether a property inspection is reasonably necessary to protect the lender's interest in the property.

29.     Upon information and belief, the Fidelity MSP/Loansphere MSP system transmits property inspection work orders to one of at least three approved vendors with which Wells Fargo has an agreement (the "Inspection Vendors").  The Inspection Vendors include LPS Field Services, Inc. and Mortgage Contracting Services, Inc.

30.     Once one of the Inspection Vendors receives the computer-generated work order, the inspection is performed and the cost is charged to the borrower's account.

31.     The vendor uploads a finished property inspection report directly into Wells Fargo's computer system.  Therefore, the computer system, rather than any person, checks the condition of the property and alerts Wells Fargo if a property is at risk.

32.     After the first property inspection is "triggered" by a default, the Wells Fargo computer system will continue to order property inspections every 20 to 45 days until the borrower cures the default.  For example, if a borrower misses one month's periodic payment, but continues to consistently make monthly periodic payments thereafter, he or she is considered by Wells Fargo to be at default on the loan until the initial default is cured.  Therefore, although a borrower continues to make regular periodic payments after having only missed one month's payment, the Wells Fargo computer system will continue to automatically generate work orders for property inspections until the initial default is cured.

33.     Further, because the property inspections are ordered based on a computer program, rather than human decision-making, property inspections may be performed on a borrower's

property regardless of the fact that the property has already been inspected numerous times and was previously deemed occupied, well-maintained and in good condition.

34.     As a loan servicer with loans owned by investor, Fannie Mae, Wells Fargo is required to follow the servicing guidelines of Fannie Mae. Failure to comply with these guidelines is probative of a failure on the part of the loan servicer to comply with state consumer protection laws. Moreover, the Fannie Mae servicing guidelines clarify what is "reasonable or appropriate" under the mortgage agreement.

35.     With respect to property inspections, Section 303 of the 2015 Fannie Mae Servicing Guidelines provide:

> Generally, the servicer does not have to inspect a property that secures a delinquent mortgage loan if it has established [Quality Right Party Contact ("QRPC")] with the borrower and is working with the borrower to resolve the delinquency … or a full payment has been received within the last 30 days.

> The servicer must order the property inspection by the 45th day of delinquency and complete the property inspection no later than the 60th day of delinquency if QRPC has not been achieved or a full payment has not been received within the last 30 days. The servicer must continue to obtain property inspections every 30 days until it establishes QRPC as long as the mortgage loan remains 45 days or more delinquent.

36.     This provision is necessary to ensure the property is occupied when a loan servicer has been *unable to establish contact with the borrower* and loan payments have not been received. But the provision does not authorize or permit inspections when the loan servicer is in contact with the borrower and knows the property to be inhabited, such as when the borrower provides a notice of occupancy to the loan servicer, or after the borrower has come current. It also does not authorize or permit duplicative inspections for borrowers with first and second mortgages.

37.     As detailed herein, Hart and other members of the Class have been in contact with Wells Fargo, have provided notice of occupancy forms, have achieved QRPC under the Fannie Mae Servicing Guidelines, and/or have become current on their loans and were no longer in default. Yet, Wells Fargo ordered property inspections, which were charged to the borrower's mortgage balance, without a legitimate basis solely to generate fees.

38.     In addition, the United States Department of Housing and Urban Development imposes a limitation on loan servicers' ability to order property inspections and charge them to borrowers. Specifically, 24 C.F.R. § 203.377 provides, in pertinent part:

> The mortgagee, upon learning that a property subject to a mortgage insured under this part is vacant or abandoned, shall be responsible for the inspection of such property at least monthly, if the loan thereon is in default. When a mortgage is in default and a payment thereon is not received within 45 days of the due date, *and efforts to reach the mortgagor by telephone within that period have been unsuccessful*, the mortgagee shall be responsible for a visual inspection of the security property to determine whether the property is vacant. The mortgagee shall take reasonable action to protect and preserve such security property when it is determined or should have been determined to be vacant or abandoned until its conveyance to the Secretary, if such action does not constitute an illegal trespass. "Reasonable action" includes the commencement of foreclosure within the time required by § 203.355(b) of this part. (emphasis added).

39.     Wells Fargo regularly conducted its mortgage servicing operations by designing, operating and managing the Fidelity MSP/Loansphere MSP computer software to intentionally charge borrowers unreasonable, improper and unlawful fees.

40.     The Fidelity MSP/Loansphere MSP system is not tied to the Hart's or Class members' mortgage agreements, but rather was designed and operated in a centralized fashion to defraud thousands of borrowers that had their mortgages serviced by Wells Fargo.

41.     As the United States Bankruptcy Court for the Eastern District of Louisiana held in *Stewart*, Wells Fargo's practice of using computer software to automatically trigger property inspections once a borrower is a certain number of days in default – and to continuously order those inspections thereafter until the default is cured – is neither reasonable nor appropriate as this practice is not designed to protect the lender's interest in the property.  Rather, these automatic inspections are actually conducted to generate additional fees and thereby create more "float" income, boosting Wells Fargo's bottom line.

42.     That these computer-generated inspections are unreasonable, confer no benefit on the lender, and serve no discernible purpose other than to generate revenue for Wells Fargo is further evidenced by the limited nature of the inspection themselves.  The property inspections ordered by the Wells Fargo computer system are mere "drive-by" inspections, *i.e.*, the inspector "drives by" the property ostensibly to assess whether the house is occupied, being maintained, and has not been damaged- a practice that provides little, if any, real opportunity to determine whether the lender's interest in the property is at risk.  Indeed, Wells Fargo personnel do not read the inspection reports.  Rather, electronic files of property inspections are stored in the Property Management Department of Wells Fargo but never read by anyone at Wells Fargo.  As a result, the observations contained in the initial inspection have absolutely no bearing on whether another inspection will be ordered in 20 or 45 days.

43.     As part of its scheme to generate fees, Wells Fargo repeatedly sent to Hart and Class members materially false and misleading agreements, contracts, and monthly mortgage statements by mail and wire.  Wells Fargo's scheme was also designed to conceal its existence.  Specifically, Wells Fargo conceals the nature of the improper and unlawful inspection fees from borrowers by listing them on the borrower's statement only as "other charges."

## Hart Has Been Victimized by Wells Fargo's Scheme

44.     Hart entered into her first mortgage agreement with Wells Fargo in February 2004. She executed a second mortgage HELOC with Wells Fargo in March 2004.

45.     Hart missed her first biweekly payment on the first mortgage loan on November 22, 2010.  She also missed the payments that came due on the first mortgage loan on December 6 and 20, 2010.

46.     Hart contacted Wells Fargo before the December 20, 2010, payment came due to discuss her financial situation and develop a plan to bring the loan current.  Wells Fargo offered a forbearance plan pursuant to which the bank agreed to forbear in its collection efforts on the loan for three months while Hart brought made reduced forbearance payments.  Hart and Wells Fargo entered into the Forbearance Agreement in December 2010.

47.     One week after entering the Forbearance Agreement, Wells Fargo notified Hart that it was canceling the Forbearance Agreement and demanded that she immediately pay all outstanding arrears and bring the loan current.  That same week Wells Fargo sent Hart Notices of Intent to Foreclose on her Mortgage Loan and her second mortgage HELOC.  The notices stated that the loans were in default and demanded immediate payment of all amounts past due, plus late charges, to cure the default.

48.     Hart was in regular contact with Wells Fargo.  She contacted Wells Fargo to discuss its purported "cancellation" of the Forbearance Agreement, on January 12, 2011.  She was advised the cancellation was a mistake and the agreement should be reinstated.  She contacted Wells Fargo again on January 31, 2011.  She was told to write a letter requesting reinstatement of the Forbearance Agreement, which she did.  She also began to receive calls from Wells Fargo

soliciting her to apply for a loan modification. She did so and was informed in a call from Wells Fargo that she had been denied a loan modification on March 1, 2011.

49.     Hart continued to communicate with Wells Fargo. She advised them that she was living in the property and intended to remain there.

50.     Wells Fargo served Hart with a foreclosure complaint at her home in November 2012 (the "Foreclosure Action"). Initially, she prepared and served her answer to complaint in December 2012. Hart retained counsel for the Foreclosure Action in April 2013.

51.     Wells Fargo began to charge Hart's mortgage account for inspection fees beginning in May 2011. It charged her $20 for each inspection conducted between May 2011 and March 2012. It charged her $15 for each inspection conducted after March 2012. Wells Fargo continued to charge Hart's mortgage account for property inspection fees until at least October 2018

52.     Wells Fargo routinely charged Hart's account for multiple property inspections during the same month. Representatives of Wells Fargo admitted in testimony in Hart's Foreclosure Action that for borrowers whose first and second mortgage loans it serviced, it routinely ordered two inspections of the borrowers' property during the same month. Wells Fargo charged Hart's account such duplicative property inspections in the same month in, at least, September 2013, October 2013, November 2013, December 2013, January 2014, February 2014, and March 2014. Wells Fargo's representatives testified that it continued to double charge borrowers whose first and second mortgage loans it services at least into May 2018.

## CLASS ALLEGATIONS

53.     Hart brings this action against Wells Fargo pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all other persons similarly situated. Hart seeks to represent the following Class and Subclass:

Nationwide class:

> All borrowers who, within the applicable statutes of limitation, were charged for inspection fees by Wells Fargo Bank, N.A.  Excluded from this class are Wells Fargo, N.A., its affiliates, subsidiaries, agents, board members, directors, officers, and/or employees, and any borrower whose loans were serviced by Wells Fargo and released their claims in the class action lawsuit styled *Young v. Wells Fargo & Company and Wells Fargo Bank, N.A.,* No. 4:08-cv-507 RP-CFB (S.D. IA. Aug. 5, 2008).

New Jersey Subclass as to Counts III, IV and V
New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et. seq.*

> All borrowers who, within the applicable statutes of limitation were charged for inspection fees by Wells Fargo Bank, N.A.  Excluded from this class are Wells Fargo, N.A., its affiliates, subsidiaries, agents, board members, directors, officers, and/or employees, and any borrower whose loans were serviced by Wells Fargo and released their claims in the class action lawsuit styled *Young v. Wells Fargo & Company and Wells Fargo Bank, N.A.,* No. 4:08-cv-507 RP-CFB (S.D. IA. Aug. 5, 2008).

54.    Hart reserves the right to modify or amend the definitions of the proposed Class and Subclasses before the Court determines whether certification is appropriate.

55.    Wells Fargo subjected Hart and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

- **Numerosity**

56.    The proposed Class is so numerous that joinder of all members would be impracticable.  Wells Fargo services over one hundred thousand mortgage loans in the State of New Jersey and nationwide.  The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Wells Fargo. The precise number of class members is at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.  Hart does not anticipate any difficulties in the management of the action as a class action.

- **Commonality**

57.    There are questions of law and fact that are common to Hart and Class members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Class.  Among such common questions of law and fact are the following:

a.   The nature, scope and operations of Wells Fargo's wrongful policies;

b.   Whether Wells Fargo charged borrowers for unnecessary and unreasonable inspection fees.

c.   Whether Wells Fargo had a policy and practice of fraudulently charging persons in arrears unlawful and unreasonable inspection fees;

d.   Whether Well Fargo breached the mortgage contracts with Hart and the Class by charging for inspection fees that were neither reasonable nor necessary;

e.   Whether Wells Fargo breached the implied covenant of good faith and fair dealing by charging for inspection fees that were neither reasonable nor necessary;

f.   Whether Wells Fargo manipulated inspection fee process in order to maximize their profits to the detriment of Hart and the Class;

g.   Whether Wells Fargo employed an unconscionable commercial practice, misrepresentation, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission by charging Hart and other borrowers unwarranted inspection fees in violation of the New Jersey Consumer Fraud Act; N.J.S.A. 56:8-1 et. seq.

h.   Whether Wells Fargo engaged in mail and wire fraud;

i.   Whether Wells Fargo engaged in a pattern of racketeering activity;

j.   Whether Wells Fargo and the Inspection Vendors formed an association in fact enterprise within the meaning of 18 U.S.C. §1961(4);

k.   Whether Wells Fargo conducted or participated in the affairs of a RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

l.   Whether the Inspection Vendors intentionally and unjustifiably interfered with Hart's and the Class's rights under the mortgage contracts by providing unnecessary and unwarranted inspection reports to Wells Fargo; and

m.  Whether Hart and the Class Members are entitled to damages and/or injunctive relief as a result of Wells Fargo' conduct.

- **Typicality**

58.     Hart is typical of the members of the Class she seeks to represent.  Hart's claims are typical of the respective Class and Subclass claims because of the similarity, uniformity, and common purpose of Wells Fargo's unlawful conduct. Each Class member has sustained, and will continue to sustain, damages in the same manner as Hart as a result of Wells Fargo's wrongful conduct.

- **Adequacy of Representation**

59.     Hart is an adequate representative of the Class s h e  seeks to represent and will fairly and adequately protect the interests of that Class.   Hart is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent her.  There is no hostility between Hart and the unnamed Class members. Hart anticipates no difficulty in the management of this litigation as a class action.

60.     To prosecute this case, Hart has chosen the undersigned law firms, which are experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

- **Requirements of Fed. R. Civ. P. 23(b)(3)**

61.     The questions of law or fact common to Hart's and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the class. All claims by Hart and the unnamed Class members are based on the unlawful imposition of property inspection fees on borrowers' mortgage accounts.

62.     Common issues predominate where, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

63.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Class as is the case at bar, common questions will be held to predominate over individual questions.

- **Superiority**

64.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

a.     Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;

b.     Individual claims by Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake.   As a result, individual Class members have no interest in prosecuting and controlling separate actions;

c.     There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

d.     The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

e.     Individual suits would not be cost effective or economically maintainable as individual actions; and

f.     The action is manageable as a class action.

- **Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

65.     Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the class.

66.     Wells Fargo has acted or failed to act in a manner generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

## BREACH OF CONTRACT

67.     Hart realleges and incorporates the allegations above as if fully set forth herein and further alleges as follows.

68.     Hart and all similarly situated Class members have mortgages that were owned and/or serviced by Wells Fargo.

69.     Hart and these Class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding property inspections. Hart's mortgage permits Wells Fargo to inspect Hart's property in limited circumstances and requires that Wells Fargo conduct itself in a reasonable manner.  Wells Fargo has breached the mortgage of Hart and other members of the Class by ordering unreasonable inspections of the property of Hart and other members of the Class.  Wells Fargo has charged Hart and other members of the Class for unreasonable inspection fees.

70.     Hart and the Class members have suffered damages as a result of Wells Fargo's breaches of contract.

## COUNT II

### BREACH OF IMPLIED COVENANT OF
### GOOD FAITH AND FAIR DEALING

71.     Hart realleges and incorporates the above allegations as if fully set forth herein and further allege as follows.

72.     A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

73.     Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

74.     Hart's and the Class Members' mortgage contracts allow Wells Fargo to inspect her property upon terms that are reasonable and appropriate in order to protect the lender's interest in the property.

75.     Wells Fargo was afforded substantial discretion.  It was permitted to unilaterally choose whether to conduct inspections when it had Quality Right Party Contact, the frequency of

inspections, and the terms of conduct for such inspections. Wells Fargo had an obligation to exercise its discretion in good faith, and not capriciously or in bad faith.

76.     The purpose of the mortgage clause allowing a lender and/or servicer, like Wells Fargo, to conduct inspections is to protect the lender's interest in the property that is collateral for the mortgage. Wells Fargo breached the implied covenant of good faith and fair dealing by making additional profits at Hart's expense by conducting unwarranted and unnecessary property inspections and charging the inspection fees to borrowers' accounts.

77.     As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Hart and the Class have suffered damages.

<u>**COUNT III**</u>

<u>**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT**</u>

78.     Hart and the New Jersey Subclass realleges and incorporates the paragraphs above as if fully set forth herein and further allege as follow.

79.     The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.,* prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation…in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A. 56:8-2.

80.     Wells Fargo engaged in unconscionable commercial practices, deceptive acts, and misrepresentations in the conduct of their trade and/or commerce in the State of New Jersey. Wells Fargo programmed its computer system to automatically generate work orders for improper property inspections that instruct vendors to conduct inspections; sending out vendors to inspect the property; arranging for vendors to upload completed electronic reports of the property

inspections directly into the automated system; assessing fees to borrowers for property inspections on their mortgage accounts; concealing the nature of the property inspection fees on monthly mortgage statements; collecting payments from borrowers that include inspection fees; and paying vendors for each property inspection completed using funds it received from borrowers.

81. Wells Fargo made numerous misrepresentations and deceptive statements in carrying out their scheme to defraud Hart and the New Jersey Subclass. For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, Wells Fargo sent monthly mortgage statements and correspondence to Hart and the Class which purported to detail the amounts due on their loans. By issuing mortgage statements to Hart and Class members, Wells Fargo represented to the Hart and Class members that all amounts due on these statements were lawful and appropriate charges. Therefore, Wells Fargo misrepresented to Hart's and Class members in their monthly mortgage statements that all fees, charges and amounts due were lawful and proper. Wells Fargo also concealed improper inspection fees as "other charges" on Hart's and Class members' mortgage statements.

82. Wells Fargo engaged in unconscionable commercial conduct by imposing unwarranted inspection fees on the mortgage accounts of Hart and members of the Class. For example, Wells Fargo imposed not less than 18 duplicative monthly inspection charges on Hart's mortgage account despite Hart living at the premises and in contact with the lender.

83. The Consumer Fraud Act further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an

action or assert a counterclaim therefore in any court of competent jurisdiction." N.J.S.A. 56:9-19.

84.　Hart and the New Jersey Subclass have suffered an ascertainable loss of moneys or property as a direct and proximate result of Wells Fargo's unconscionable practices. Wells Fargo programmed its computer system to automatically generate work orders for improper property inspections that instruct vendors to conduct inspections; assessing fees to borrowers for property inspections; concealing the nature of the property inspection fees and collecting payments from borrowers that include inspection fees.

85.　Hart and the New Jersey Subclass have a private right of action against Wells Fargo to recover, in addition to their actual damages, a threefold award of the damages sustained by any person's interest, as well as an award of reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A. 56:8-19.

### COUNT IV

### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)

86.　Hart realleges and incorporates the above allegations as if fully set forth herein and further alleges as follows.

### RICO ALLEGATIONS

### THE RICO ENTERPRISE

87.　Wells Fargo is a "person" within the meaning of 18 U.S.C. § 1961(3).

88.　Based upon Hart's current knowledge, the following persons constitute a group of individuals associated in fact that will be referred to herein as the "Wells Fargo Enterprise": (1) Wells Fargo, and (2) vendors, including LPS Field Services, Inc. ("LPS") and Mortgage Contracting Services, Inc., ("MCS Contracting," and collectively with LPS, the "Inspection

Vendors"), which conducted the property inspections billed to Hart and Class members complained of herein.

89. The Wells Fargo Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

90. The members of the Wells Fargo Enterprise function as a continuing unit and share the common purpose of maximizing their profits by charging Hart and Class members improper fees.

91. The Wells Fargo Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Defendant Wells Fargo and the vendors that perform property inspections. Wells Fargo's computer system is a common communication network by which Wells Fargo and the Inspection Vendors share information. This common communication network allowed Wells Fargo to charge Hart and Class member's improper fees and to exchange the resulting profits.

92. While Wells Fargo, LCS and MCS Contracting are all members of the Wells Fargo Enterprise and participate in the Wells Fargo Enterprise, they also have an existence separate and distinct from the enterprise.

93. Wells Fargo controls, operates, and directs the affairs of the Wells Fargo Enterprise by, among other things, programming their computer system to automatically generate work orders for improper property inspections that instruct vendors to conduct inspections; sending out vendors to inspect the property; arranging for vendors to upload completed electronic reports of the property inspections directly into the automated system; assessing fees to borrowers for property inspections only monthly mortgage statements; concealing the nature of the property inspection fees on monthly mortgage statements; collecting payments from borrowers that include inspection

fees; and paying vendors for each property inspection completed using funds received from borrowers.

94.     The Wells Fargo Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Wells Fargo engage.

## PREDICATE ACTS

95.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Wells Fargo has engaged, and continues to engage, in conduct violating each of these laws to effectuate their scheme.

## VIOLATIONS OF 18 U.S.C. § 1343

96.     For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, Wells Fargo, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the U.S. Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the U.S. Postal Service or commercial interstate carriers, including, but not limited to, agreements, monthly mortgage statements, correspondence, checks, and inspections reports.

97.     For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, Wells Fargo, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things including, but not limited to, agreements, monthly mortgage statements, correspondence, wire transfers, and inspections reports, and made or caused to be made false statements over the telephone, facsimile, electronic mail, and interne.

98.     The matter and things sent by Wells Fargo via the U.S. Postal Service, commercial carrier, wire, or other interstate electronic media included, *inter alia*: agreements, monthly mortgage statements, correspondence, payments and inspection reports.

99.     Other matter and things sent through or received via the U.S. Postal Service, commercial carrier, wire, or other interstate electronic media by Wells Fargo included information or communications in furtherance of or necessary to effectuate the scheme.

100.     The monthly mortgage statement received by Hart and Class members detail the amounts due on their loans. By issuing mortgage statements to Hart and Class members, Wells Fargo represented to Hart and Class members that all amounts due on these statements were lawful and appropriate charges.  Therefore, Wells Fargo misrepresented to Hart and Class members in their monthly mortgage statements that all fees, charges and amounts due were lawful and proper. Wells Fargo also concealed improper inspection fees as "other charges" on Hart's and Class members' mortgage statements.  Wells Fargo's misrepresentations, acts or concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Hart and the members of the Class and obtaining their property for Wells Fargo's gain.

101.     There were numerous acts of mail and wire fraud that were used to carry out the scheme.  It is impracticable for Hart to plead all details of the scheme with particularity as to precise dates of all of Wells Fargo's uses of the U.S. mail and interstate wire facilities, and corresponding acts of mail and wire fraud, as this information cannot be alleged without access to Wells Fargo's records.

102.     Wells Fargo either knew, or recklessly disregarded, the fact that the misrepresentations and omissions described above were material, and caused Hart and the Class to suffer damages.  Had Hart and Class members known the truth that these improper charges and

inspection fees were a profit center for Wells Fargo rather than a mechanism to reasonably protect the lender's interest in the property, they could have taken steps to avoid the charges and would not have paid the improper charges.

103.     As a result, Wells Fargo has obtained money and property belonging to the Hart and the Class, and Hart and the Class have been injured in their business or property by the Wells Fargo's overt acts of mail and wire fraud.

### PATTERN OF RACKETEERING ACTIVITY

104.     The Wells Fargo has engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing to at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C §§ 1341 and 1343 as described above, within the past four years.  In fact, Wells Fargo has committed thousands of acts of racketeering activity.  Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Hart and Class members.

105.     The multiple acts of racketeering activity that Wells Fargo committed were related to each other and amount to and pose a threat of continued racketeering activity, and therefore, constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

106.     By reason, and as a result of, Wells Fargo's conduct and participation in the racketeering activity alleged herein, Wells Fargo  has caused damages to Hart and Class Members in the form of unreasonable and unnecessary property inspection fee charges imposed on their mortgage accounts.

## COUNT V

## VIOLATION OF RACKETEER INFLUENCED AND
## CORRUPT ORGANIZATIONS, 18 U.S.C. § 1962(d)

107.    Hart realleges and incorporates the allegations above as if fully set forth herein.
Hart further allege as follows:

108.    At all relevant times, Wells Fargo was associated with the enterprise and agreed
and conspired to violate 18 U.S.C. § 1962(d).  Wells Fargo agreed to conduct and participate,
directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering
activity, in violation of 18 U.S.C. § 1962(d).

109.    Wells Fargo agreed to program their computer system to automatically generate
work orders for improper property inspections that instruct vendors to conduct inspections;
sending out vendors to inspect the property; arranging for vendors to upload completed electronic
reports of the property inspections directly into the automated system; assessing fees to borrowers
for property inspections only monthly mortgage statements; concealing the nature of the property
inspection fees on monthly mortgage statements; collecting payments from borrowers that include
inspection fees; and paying vendors for each property inspection completed using funds received
from borrowers.

110.    Wells Fargo  committed and caused to be  committed a  series of  overt acts  in
furtherance of the conspiracy and to affect the objects thereof, including, but not limited to, the
acts set forth above.

111.    As a result of Wells Fargo's violations of 18 U.S.C. § 1962(d), Hart and Class
Members suffered damages in the form of unreasonable and unnecessary property inspection fee
charges imposed on their mortgage accounts.

26

## PRAYER FOR RELIEF

**WHEREFORE**, Hart on behalf of herself and all similarly situated individuals, demands judgment against Wells Fargo as follows:

(1)    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Hart and their counsel to be representatives of the Class and the New Jersey Subclass;

(2)    Enjoining Wells Fargo from continuing the acts and practices described above;

(3)    Awarding damages sustained by Hart, the Class and the New Jersey Subclass as a result of Wells Fargo's breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(4)    Awarding Hart, the Class and the New Jersey Subclass compensatory, treble, and punitive damages, injunctive relief, declaratory relief, attorneys' fees, and costs, and civil penalties under the New Jersey Consumer Fraud Act;

(5)    Awarding Hart, the Class and the New Jersey Subclass compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute;

(6)    Awarding Hart, the Class and the New Jersey Subclass punitive damages;

(7)    Awarding Hart, the Class and the New Jersey Subclass costs and disbursements and reasonable allowances for the fees of Hart's, the New Jersey Subclasses and the Class's counsel and experts, and reimbursement of expenses; and

(8)    Awarding such other and further relief the Court deems just and equitable.

## JURY DEMAND

Hart, the Class and the New Jersey Subclass demand a trial by jury on all claims so triable as a matter of right.

DATED:  August 4, 2021

                                                Law Offices of Roosevelt N. Nesmith LLC

                                                By:  _s/ Roosevelt N. Nesmith___
                                                      Roosevelt N. Nesmith, Esq.

                                                363 Bloomfield Avenue, Suite 2C
                                                Montclair, NJ 07042
                                                Tel: (973) 259-6990
                                                Fax: (866) 848-1368

                                                **GISKAN SOLOTAROFF & ANDERSON LLP**
                                                Catherine E. Anderson, Esq.
                                                90 Broad Street, 2nd Floor
                                                New York, NY 10004
                                                Tel: (212) 847-8315
                                                Fax: (646) 520-3236
                                                *canderson@gslawny.com*

                                                *Attorneys for Jane Ann Hart and*
                                                *the Putative Classes*